UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

MICHAEL MILAN,

        Plaintiff,

   v.

UNION PACIFIC RAILROAD COMPANY,
a Delaware Corporation,

        Defendant.

Case No. 3:17-cv-01246-YY

FINDINGS AND
RECOMMENDATIONS

YOU, Magistrate Judge:

    Plaintiff Michael Milan bring claims against defendant Union Pacific Railroad Company ("UPRR") for violations of the Americans with Disabilities Act ("ADA") and the Age Discrimination in Employment Act ("ADEA"). This court has jurisdiction over plaintiff's claims under 28 U.S.C. § 1331.

    UPRR has filed a motion for summary judgment (ECF #27) on all claims. For the reasons discussed below, the motion should be GRANTED.

1 – FINDINGS AND RECOMMENDATIONS

**BACKGROUND FACTS**

**I.     Incident**

Plaintiff began working for UPRR in 1977.  Milan Dep. 13, ECF #29-1.[1]  He was employed as a locomotive engineer since 1979.  *Id*. at 16, ECF #27-1.  The engineer is responsible for driving the train, i.e., running the engines and running the train over the rails.  *Id*. at 21, 23, ECF #27-1.

At the time of the incident, plaintiff was working the Portland to Hinkle route.  *Id*. at 16, ECF #27-1.  This route took an average of 10 hours and was staffed with two people—a locomotive engineer and a conductor.  *Id.* at 20, ECF #27-1.  According to plaintiff, the conductor is "responsible for the train."  *Id*. at 21, ECF #21-7.

As a safety feature, each train has an alerter.  The alerter intermittently flashes a light, and if the engineer does not acknowledge the alerter by pressing a button, then the light begins to flash more frequently.  *Id.* at 24, ECF #27-1.  If the engineer continues to disregard the alerter, it makes an audible sound that gets louder and louder.  *Id.*  If the engineer continues to be unresponsive, the train will stop automatically.  *Id.*

On March 4, 2015, plaintiff was driving a 7,000-foot garbage train with four engines and approximately 100 cars when he lost consciousness.  *Id.* at 38, ECF #27-1.  The train was moving at the time, and plaintiff was seated in the engineer's chair.  Decl. Holland, ¶ 18, ECF #34.  According to the conductor, who was present, plaintiff failed to respond to the alerter and also did not respond when the conductor touched him.  *Id.*  Plaintiff remained seated upright in the chair, was staring his eyes open, and was unresponsive for several minutes.  *Id*.

---

[1] The parties have provided excerpts of plaintiff's deposition in different documents.  For reference, the documents are separately identified by their ECF designations.

Plaintiff recalls "easing out of Cascade Locks,[2] and the next thing I remember we were stopped just east of Cascade Locks," when the conductor told him an ambulance was on its way. Milan Dep. 31, 32, ECF #27-1.  Plaintiff has no recollection of anything "in between" or how the train stopped, but assumes the alerter was tripped.  *Id.* at 32-33, ECF #27-1.

## II.  Plaintiff's Doctors' Opinions

Following the incident, plaintiff was hospitalized overnight.  *Id*. at 45, ECF #27-1.  Upon returning to Portland, plaintiff saw his primary care physician, Dr. Wahls, who referred him to specialists.  *Id.* at 45-46, ECF #27-1.  On May 14, 2015, plaintiff saw Dr. Justin Meuse, a neurologist.  ECF #27-1, at 42.  Plaintiff told Dr. Meuse that, before losing consciousness, he had an odd sensation in his head that was kind of a lightheaded feeling.  *Id.*  Emergency department records show that plaintiff reported experiencing palpitations and dimming of vision before he lost consciousness.  *Id.*  Plaintiff had no convulsive activity and was not slumped over; however, he was unresponsive.  *Id.*  Plaintiff also reported "numbness/tingling" on the right side of his lip and his right fingertips.  *Id.*

Plaintiff told Dr. Meuse that he had a somewhat similar event while staying overnight at the company hotel in Hinkle, awaiting a return trip to Portland the following day.  Milan Dep. 40, 44, ECF #27-1.  Plaintiff had started blood pressure medication and was asleep in the hotel when he "stood up to go use the restroom and went right down."  *Id.* at 39, ECF #27-1.  He believes he was unconscious for seconds, but admitted he did not have a timer and does not know how long he was actually unconscious.  *Id*.  Plaintiff did not report the incident to his employer because he did not feel it was necessary.  *Id.* at 46, ECF #27-1.

---

[2] Cascade Locks is approximately 30 miles outside of Portland.  Milan Dep. 31, ECF #27-1.

Initially, Dr. Meuse was concerned because plaintiff lost consciousness while seated, raising the risk that arrythmia caused the event. ECF #30-2. After plaintiff's electroencephalogram ("EEG") came back normal, Dr. Meuse concluded that plaintiff had "far less than a 5% chance of having epilepsy," and that, "[f]rom a seizure standpoint," it was safe for him to drive and return to work. ECF #33-1, at 19. Dr. Meuse also concluded that plaintiff's "description of the event sounds most consistent with a syncopal event" and "could have been due to recently restarting his anti-hypertension regimen after a few weeks without." Ex. 30-2.

Dr. Wahls, in his declaration, states that "[n]one of the medical evidence justifies the conclusion that [plaintiff] suffered from a seizure disorder at the time he blacked out, nor that he has ever suffered from a seizure disorder[,] nor that he suffers from a seizure disorder at this time." Wahls Decl. ¶ 5, ECF #31. Dr. Wahls also notes that testing has ruled out a neurological or cardiac disorder. *Id*. ¶ 7. Dr. Wahls explains that plaintiff has been prescribed Amlodipine, Atenolol, and Lisinopril to manage his hypertension, and "[e]ach of these drugs may cause side effects including dizziness, lightheadedness, and fainting, among others." *Id.* ¶ 12. According to Dr. Wahls, the side effects can be "avoided by management of the dosage by the patient's physician." *Id.* Dr. Wahls cleared plaintiff for work because he "found no evidence that would suggest re-occurrence of sudden unconsciousness." *Id.* ¶ 7. Dr. Wahls opines it is "very unlikely" plaintiff will suffer a future episode, and the risk of plaintiff suffering a seizure while operating a train is no greater than any other locomotive engineer of similar age on high blood pressure medication. *Id.* ¶¶ 6, 10.

At his deposition, plaintiff testified that Dr. Wahls had told him there was a low chance of a repeated occurrence. Milan Dep. 65, ECF #27-1. When asked what "low" meant to him, plaintiff said 25 or 30 percent. *Id.* at 66, ECF #27-1.

### III.     UPRR's Policies

According to National Transportation Safety Board ("NTSB") investigation reports regarding railroad accidents, multiple serious or fatal railroad accidents have been caused by the sudden incapacitation or significant functional impairment of a locomotive engineer while operating a train. Holland Decl. ¶ 9, ECF #34. Therefore, since at least 2004, the NTSB has repeatedly recommended that the Federal Railroad Administration ("FRA") adopt comprehensive medical fitness-for-duty requirements for safety critical railroad workers[3] and remove workers from safety critical tasks if they have a health condition that poses a significant risk for sudden incapacitation at work. *Id.*

For these reasons, since 2010, UPRR "has taken a more conservative approach for employees with seizure disorders or other risks for sudden incapacitation at work." ECF #29-5, at 2. UPRR has a policy that "[a] worker in a Safety Critical Position requires appropriate medical work restrictions as long as the risk of sudden incapacitation has a probability of greater than 1% per year occurrence rate. This is a generally accepted level of unacceptable risk for transportation workers and has been adopted by UPRR in making medical Fitness-for-Duty determinations." *Id.* at 1. Individuals who do not meet this 1% standard may "not work on or around moving trains, and not operate vehicles or on-track equipment." *Id*. At his deposition, plaintiff conceded that Dr. Meuse's opinion that he has less than five percent chance of epilepsy is greater than one percent. Milan Dep. 87, ECF #27-1.

UPRR also generally recognizes that "[f]or a worker in a Safety Critical Position (i.e., employees in field operations or train dispatchers) an episode of sudden incapacitation (from a

---

[3] "All railroad jobs involving field operations, including dispatchers, are Safety Critical Positions." ECF #29-5, at 2.

seizure or any other cause) poses a significant and imminent risk for substantial harm to the worker, co-workers, the public, property, and environment." ECF #29-5, at 1. At his deposition, plaintiff testified that he agreed with that statement. Milan Dep. 86-87, ECF #27-1. Plaintiff further testified that if the railroad "believe[s] it's unsafe for me to return to work, that's their opinion and I would have to agree with that." *Id*. at 114-15, ECF #27-1. Plaintiff testified that the railroad has the "ultimate responsibility" for determining whether he was safe to operate as train as an engineer. *Id*. at 79, ECF #33-1. In fact, the first sentence in the Fitness-for-Duty Evaluations document states that "Union Pacific maintains the final authority for determining whether an employee is fit for duty." ECF #27-1, at 69.

## IV.  UPRR's Doctors' Opinions

UPRR physicians use reasonable medical judgement and medical fitness for duty determinations for safety crucial workers that include: (1) an individualized assessment of an employee's health conditions, (2) evidence-based evaluation of the risk for sudden incapacitation related to the employee's specific health condition, (3) a uniform threshold of acceptable risk for sudden incapacitation (of no greater than 1% annual occurrence rate), and (5) application of functional work restrictions if the employee's health condition is determined to pose an unacceptable safety risk for work. Holland Decl. ¶ 12, ECF #34. UPRR also "strives to make medical Fitness-for-Duty determinations that are consistent with scientific evidence in the epidemiological literature, and opinions of medical expert groups, regarding probability of future seizures in specific clinical scenarios." ECF #29-5, at 1.

According to Dr. John Holland, Chief Medical Officer for UPRR, a seizure is a neurological event due to a sudden electrical discharge within the brain. *Id*. It always causes sudden incapacitation, because the person either loses consciousness or has impaired awareness

that will last for several minutes.  *Id.*  After a seizure, a person will suffer a period of confusion that lasts 20-30 minutes.  *Id.*

Holland further cites to "multiple scientific studies" showing that adults who have had a single loss of consciousness event due to a seizure, syncopal episode, or an unknown cause have about a 15% to 40% risk of having a similar loss of consciousness episode within the next year.  Holland Decl. ¶ 25, ECF #34.  Individuals with a history of two or more loss of consciousness episodes due to any of these causes have an even higher risk of experiencing a third loss of consciousness in the upcoming year.  *Id.*  For such individuals, the occurrence of seizures is unpredictable and cannot be reliably prevented with medication or other treatment.  ECF #29-5, at 1.  Moreover, "[a]dults with new onset seizure disorders are at significantly increased risk for future seizures, based on multiple studies in the scientific literature."  *Id.*

Dr. Holland believes that one of the best evidence-based reviews of this issue are reports of the 2007 Medical Expert Panel on Seizure Disorders, sponsored by the US Federal Motor Carriers Safety Administration (FMCSA).  *Id.*  While that panel focused on the risks for recurrent seizures in commercial drivers, "the scientific evidence reviewed and panel recommendations apply equally well to workers in other Safety Critical Positions where sudden incapacitation poses a significant safety risk for the individual employee and others."  *Id.*

UPRR retained Dr. Reed Wilson, a neurologist, to examine plaintiff's medical records for purposes of determining whether he had a health condition that posed safety risks for work in a safety critical position.  ECF #27-1, at 59.  Dr. Wilson concluded that plaintiff's episode of unconsciousness is of undetermined etiology, but seizures and arrhythmia remain a possible etiology.  *Id*. at 62.  Dr. Wilson believes that plaintiff has a moderate to high risk for future sudden incapacitation.  *Id.*  He recommended that plaintiff should have indefinite restrictions

7 – FINDINGS AND RECOMMENDATIONS

until a cause for his episode of sudden incapacitation is determined and can be adequately addressed. *Id.* at 63. He noted that, "[f]or individuals who work in a safety critical position for [the railroad], such as [plaintiff], a sudden incapacitation event at work can result in substantial harm to the worker, coworkers, the public, property, and the environment." *Id.* at 61.

Dr. Wilson based his recommendation on evidence-based medical guidance regarding safety risks for workers in safety sensitive jobs, including the FMCSA and NTSB reports referenced above. *Id.* at 61-62. Dr. Wilson explained that, according to FMCSA guidance reports, an individual with moderate to high risk of sudden incapacitation should have indefinite restrictions until a cause for the episode of sudden incapacitation is determined and can be adequately addressed. *Id.* at 63.

Relying on Dr. Wilson's opinion, Dr. Holland concluded that plaintiff had an unacceptable risk for a future loss of consciousness event that was greater than 1% annual occurrence rate. Holland Decl. ¶ 23, ECF #34. Dr. Holland explained that, if a locomotive engineer has a sudden incapacitation while operating a train, it could "cause a serious and possibly fatal railroad accident involving a collision with another train, or vehicles or people on the track, or a train derailment that may result in a release of hazardous materials, explosion or fire." *Id.* ¶ 8.

**V.    Post-Incident Facts**

On October 6, 2015, UPRR advised plaintiff that it was unable to identify a reasonable accommodation that would permit him to safely return to work in his assigned position. ECF #27-1, at 65. Plaintiff was prohibited from operating vehicles on the tracks and working on or near moving trains. Milan Dep. 72, ECF #29-1; ECF #27-1, at 66. Because plaintiff was unable to fulfill the duties of his occupation, he was considered occupationally disabled under his

contract. Milan Dep. 71, ECF #27-1. Plaintiff filed for occupational disability benefits, consistent with retirement benefits. *Id.*

UPRR informed plaintiff that "[t]hese work restrictions are ongoing, but can be reassessed if there is adequate medical documentation that establishes the definitive cause of the health event or condition." ECF #27-1, at 66; Milan Dep. 75, ECF #27-1. At his deposition, plaintiff testified that he was not working on obtaining any updated medical information and had no plans to do so in the future. Milan Dep. 78, ECF #33-1. He explained, "I had tests on top of tests . . . [and] they already seem to think there's nothing wrong." *Id*. However, elsewhere, plaintiff stated that his union told him that he needed to hire another doctor or his grievance "wouldn't likely go anywhere," but he "was in no position financially to pay for another doctor examination." *Id*. at 95, ECF #33-1.

UPRR suggested that there might be a yardmaster position available in Hinkle, but plaintiff did not want to return to Hinkle. *Id.* at 84, ECF #27-1. Plaintiff did not want to consider any employment other than working as a locomotive engineer. *Id.* at 83, ECF #27-1. UPRR offered plaintiff the opportunity to participate in a vocational counseling program to assist him in obtaining either internal or external jobs; however, plaintiff declined, opting instead to "take the occupational disability with railroad retirement," i.e., the "retirement route." *Id.* at 84-85, ECF #27-1.

## FINDINGS

### I.     Summary Judgment Standard

Under FRCP 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party moving for summary judgment bears the initial responsibility of

informing the court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (citing FRCP 56(e)).

In determining what facts are material, the court considers the underlying substantive law regarding the claims. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Otherwise stated, only disputes over facts that might affect the outcome of the suit preclude the entry of summary judgment. *Id.*

A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248-49. A "scintilla of evidence" or "evidence that is merely colorable or not significantly probative" is insufficient to create a genuine issue of material fact. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). The court "does not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir. 1999). "Reasonable doubts as to the existence of material factual issue are resolved against the moving parties and inferences are drawn in the light most favorable to the non-moving party." *Addisu,* 198 F.3d at 1134 (citation omitted).

## II.    ADA Claim

UPRR argues that summary judgment should be granted because (1) it did not regard plaintiff as disabled (Mot. 8, ECF #27); (2) plaintiff was not a qualified individual with a disability because he could not perform the essential functions of his job (*id.* at 10); and (3) plaintiff posed a direct threat to himself or others (*id.* at 12). Because, as discussed below, there

is no genuine issue of material fact regarding whether plaintiff posed a direct threat, this court may grant summary judgment without reaching UPRR's other arguments.

Under the ADA, an employer may assert, as an affirmative defense,[4] that

> an alleged application of qualification standards . . . that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter.

42 U.S.C. § 12113(a). Qualification standards "may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b). The ADA defines "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation."[5] 42 U.S.C. § 12111(3).

A determination that an individual poses a "direct threat" must be "based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job." 29 C.F.R. § 1630.2(r); *see also Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1248 (9th Cir. 1999) ("To protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear, the Supreme Court has required an individualized direct threat inquiry that relies on the best current medical or other objective evidence."). Moreover, the assessment must be based on a reasonable medical judgment that relies on the

---

[4] "Because it is an affirmative defense, the burden of establishing a direct threat lies with the employer." *Echazabal v. Chevron USA, Inc.*, 336 F.3d 1023, 1027 (9th Cir. 2003); *see also Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999).

[5] ADA regulations further define direct threat as "a significant risk of substantial harm to the health or safety of the individual or others[.]" 29 C.F.R. § 1630.2(r). The Supreme Court has held that direct threat includes threats to an employee's own health. *Echazabal*, 336 F.3d at 1026.

11 – FINDINGS AND RECOMMENDATIONS

most current medical knowledge and/or on the best available objective evidence. *Id.* Factors to be considered in determining whether an individual would pose a direct threat include:

> (1) the duration of the risk,
>
> (2) the nature and severity of the potential harm,
>
> (3) the likelihood that the potential harm will occur, and
>
> (4) the imminence of the potential harm.

*Id.*

The court may grant summary judgment if there is no genuine issue of material fact regarding whether the plaintiff posed a direct threat. *Nunes*, 164 F.3d at 1247.

Here, UPRR has a qualification standard that "[a] worker in a Safety Critical Position with a health condition(s) associated with greater than 1% per year probability of sudden incapacitation is considered . . . to pose an unacceptable safety risk and is given appropriate work restrictions." ECF #29-5, at 2. This is a generally accepted level of unacceptable risk for transportation workers. *Id.* at 1. Plaintiff does not challenge this qualification standard on the basis that it is not job-related or consistent with business necessity. *See Montgomery v. Union Pac. R.R. Co.*, No. CV-17-00201-TUC-RM, 2018 WL 6110930, at *8 (D. Ariz. Nov. 21, 2018).[6] Thus, this court turns to the question of whether there is a genuine issue of material fact that plaintiff had a "greater than 1% per year probability of sudden incapacitation."

---

[6] In *Montgomery*, the plaintiff raised a material issue of fact as to whether the 1% policy "fairly and accurately measure[d]" his ability to perform the job safely. 2018 WL 6110930, at *8. The court noted that the 1% policy is not required by federal law, although there was some evidence that the Railroad Safety Advisory Committee intended to adopt it. *Id.* Thus, the court found the defendant had not "indisputably shown that the 1% policy is 'job-related.'" *Id.* Plaintiff makes no such argument in this case.

12 – FINDINGS AND RECOMMENDATIONS

The record reveals there is uncertainty among the medical experts as to what caused plaintiff to lose consciousness. UPRR's expert, Dr. Wilson, believes that plaintiff's loss of consciousness is of an undetermined etiology, and that seizures and arrhythmia remain a possible cause. ECF #27-1, at 62. Dr. Holland asserts that, irrespective of the cause, "[m]ultiple scientific studies show that adults who have had a single loss of consciousness event due to a seizure, syncopal episode, or an unknown cause all have about a 15% to 40% risk of having a similar recurrent loss of consciousness episode within the next year." Holland Decl. ¶ 25, ECF #34. For individuals with a history of two or more loss of consciousness episodes due to any of these causes, the risk of a third episode in the coming year is even higher. *Id.* Dr. Wilson similarly opines that plaintiff has a moderate to high risk for future sudden incapacitation. ECF #27-1, at 62.

Plaintiff's neurologist, Dr. Meuse, concludes there is "far less than a 5% chance" that plaintiff has epilepsy, but has not ruled it out conclusively or to UPRR's 1% standard. ECF #33-1, at 19. Dr. Meuse opines that "the event sounds most consistent with a syncopal event" and "could have been due to recently restarting his anti-hypertension medicine after a few weeks without." Ex. 30-2. Plaintiff's primary physician, Dr. Wahls, notes that "[n]one of the medical evidence justifies the conclusion" that plaintiff suffers from a seizure disorder, and testing has ruled out a neurological or cardiac disorder. Wahls Decl. ¶¶ 5, 7. Dr. Wahls explains that the side effects of plaintiff's hypertension medication include "dizziness, lightheadedness, and fainting, among others," which can be "avoided by management of the dosage by the patient's physician." *Id.* ¶ 12. Dr. Wahls cleared plaintiff for work because he "found no evidence that would suggest re-occurrence of sudden unconsciousness." *Id.* ¶ 7. Dr. Wahls opines it is "very unlikely" plaintiff will suffer a future episode, and the risk of plaintiff suffering a seizure while

operating a train is no greater than any other locomotive engineer of similar age on high blood pressure medication. *Id.* ¶¶ 6, 10.

Importantly, neither of plaintiff's doctors has said there is a less than 1% per year probability that plaintiff will experience another episode of sudden incapacitation. Dr. Wahls, who submitted his declaration in response to UPRR's motion for summary judgment, had every opportunity to do so; however, at most he assures that it is "very unlikely" plaintiff will suffer a future episode. Wahls Decl. ¶ 6, ECF #31. Even by plaintiff's own interpretation, that is far greater than 1%.[7] *Id.* ¶ 6; Milan Dep. 66, ECF #27-1. Thus, there is no genuine issue of material fact as to whether plaintiff has satisfied UPRR's qualification standard.

Moreover, the Ninth Circuit has held that even where the "likelihood of an accident is small, . . . the severity and scale of the potential harm to others . . . pose[s] a significant risk under the direct-threat analysis." *Hutton v. Elf Atochem North America, Inc.*, 273 F.3d 884, 894 (9th Cir. 2001) (citing *Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 231 (3d Cir. 2000) (recognizing that "[i]f the threatened harm is grievous . . . even a small risk may be 'significant'"). Hutton suffered from Type I diabetes, and worked at a chlorine manufacturing plant where he experienced a "number of diabetic episodes," including an incident at work where he lost consciousness.[8] *Id.* at 886-87. Hutton was suspended after he experienced an insulin reaction at work, during which he was light-headed and could not communicate for several

---

[7] Plaintiff interpreted Dr. Wahls' assessment of his risk to be at 25 or 30 percent. Milan Dep. 66, ECF #27-1.

[8] Hutton was repeatedly advised to check his blood sugar levels and ultimately was required to following medical supervision and other conditions to maintain his employment. 273 F.3d at 887. Hutton also signed a letter in which he acknowledged the "[f]ailure to abide by any of the above conditions, or another incident of insulin reaction or diabetes loss of function," would leave his employer with no alternative but to immediately terminate his employment. *Id*.

14 – FINDINGS AND RECOMMENDATIONS

minutes. *Id.* at 888. "None of the examining or consulting doctors could rule out the occurrence of a hypoglycemic event that would affect Hutton's ability to remain conscious, alert, and communicative, especially in light to [his] somewhat erratic medical history." *Id.* at 894. Further, despite the fact that there was an elaborate safety system in place, a chlorine finishing operator was required to work essentially alone. *Id.* Under the circumstances, another unconscious episode could be "catastrophic." *Id.* "Hutton himself conceded that, if he were unconscious, chlorine could spill from the rail cars, convert to gas, and cause severe—potentially fatal—harm to other workers and persons near the facility." *Id.*

For guidance, the Ninth Circuit turned to a Fifth Circuit case, *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090 (5th Cir. 1996) (per curiam). There, the plaintiff suffered from late adult-onset diabetes and was employed in a position that required him to work with complicated machinery and dangerous chemicals. *Id.* at 1094. The Third Circuit concluded that the plaintiff was a "walking time bomb" because "[a]ny diabetic episode or loss of concentration occurring while operating . . . machinery or chemicals had the potential to harm . . . others." *Id*. The Ninth Circuit found no distinction between *Turco* and Hutton's case, "where it is not disputed that a significant physical or mental lapse by Hutton as a result of a diabetic episode could result in substantial harm to his co-workers and others." *Hutton*, 273 F.3d at 894.

Ultimately, in reaching this conclusion, the Ninth Circuit applied the four factors set forth in the ADA regulations, and found that an individualized assessment of each factor supported the conclusion that Hutton posed a direct threat:

> (1) The duration of the risk would exist for as long as Hutton held the chlorine finishing operator's job; (2) The nature and severity of the potential harm is catastrophic—many lives could be lost; (3) Although the likelihood that the potential harm will occur is small, whether and when it will occur cannot be predicted; and (4) The imminence of the potential harm is, as explained, unknown because of the unpredictability of Hutton's condition.

*Id.* at 894-95 (citing 29 C.F.R. § 1630.2(r)).

When those factors are applied in this case, it results in the same conclusion. As discussed above, the cause of plaintiff's unconsciousness is uncertain. Where the cause has not been conclusively established, and other causes have not been ruled out, the duration of the risk is indefinite. The second factor is also met, as the nature and severity of potential harm could be catastrophic. Plaintiff was unconscious for several minutes. His position as a locomotive engineer, driving a 7,000-ton 100-car train, involves "duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Skinner v. Railway Labor Executives' Ass'n.*, 489 U.S. 601, 628 (1989); *see also E.E.O.C. v. United Parcel Serv., Inc.*, 424 F.3d 1060, 1074–75 (9th Cir. 2005) ("[C]onstant mental alertness is an essential requisite of operating a locomotive and train, and a train engineer who was susceptible to dizziness and blackouts posed a significantly greater danger to others despite his extensive and completely safe record as an engineer.") (citation and quotation marks omitted).

As to the third factor, even assuming the likelihood of recurrence is small, because the cause is uncertain, whether and when it will occur cannot be predicted. For the same reasons, the fourth factor, "imminence of the potential harm is . . . unknown because of the unpredictability of [plaintiff's] condition." *Hutton*, 273 F.3d at 894-95. Thus, all four factors are met in this case. As in *Hutton*, even though the "likelihood of an accident is small, . . . the severity and scale of the potential harm to others . . . pose[s] a significant risk under the direct-threat analysis." *Id.* at 894.

Plaintiff takes issue with the fact that UPRR made its decision "based on the opinion of two doctors who never saw or met [him] or spoke with [his] doctors." Resp. 13, ECF #28. However, this fact is inconsequential because plaintiff's own doctors cannot provide an opinion

that satisfies UPRR's qualitative standard; they state only that plaintiff's episode "sound[ed] like" and "could have been" the result of hypertension, and it was merely "very unlikely" that it would not happen again.  ECF #30-2; Wahls Decl. ¶ 6, ECF #31.

Plaintiff also argues there is no clear evidence that he suffered a seizure.  Resp. 12, ECF #28.  But it is precisely the uncertain nature of plaintiff's condition that supports UPRR's argument that it poses a direct threat.  If anything, not knowing the cause makes plaintiff a greater safety risk, because it more difficult to predict when and where such an incident will happen again.  In fact, Dr. Wilson recommended that plaintiff "should have indefinite restrictions until a cause for his episode of sudden incapacitation is determined and the cause can be adequately addressed."  ECF #27-1, at 63.

Plaintiff relies heavily on Dr. Wahls' statement that the risk he will suffer another seizure is "no greater than any other locomotive engineer of similar age on high blood pressure medication."  Wahls Decl. ¶¶ 6, 10, ECF #31.  However, in that same declaration, Dr. Wahls puts plaintiff's risk of having another episode at "very unlikely," which even by plaintiff's own interpretation is far greater than 1%.  *Id.* ¶ 6; Milan Dep. 66, ECF #27-1.  Moreover, the Ninth Circuit's decision in *Hutton* establishes that common medical conditions, such as diabetes and high blood pressure, may constitute a direct threat when the "nature and severity of the potential harm is catastrophic."  273 F.3d at 894.

Plaintiff also argues that "[a] genuine issue of material fact exists when a treating doctor releases a patient to work and a non-treating company doctor terminates the employee based on a determination that the employee is a direct threat."  Resp. 13, ECF #28 (citing *EEOC v. Browning-Ferris, Inc.*, 262 F. Supp. 2d 577, 587-91 (D. Md. 2002)).  In *Browning-Ferris*, an employee of a waste management facility was on a regimen of immunosuppressant medications

17 – FINDINGS AND RECOMMENDATIONS

due to her Crohn's disease, and the company doctor determined that prolonged exposure to large volumes of waste posed a direct threat of harm to the employee because her medication left her at greater risk to infection. *Id.* at 587-88. The employee's treating doctor, on the other hand, concluded that her medications did not increase her risk of infection. *Id.* at 590.

In this case, while plaintiff's doctors released him back to work, none of them have attested that the probability of sudden incapacitation meets UPRR's 1% standard. Moreover, the nature and the severity of the potential harm in *Browning-Ferris* was limited to the employee herself whereas here, the potential harm could impact not only plaintiff, but also his coworkers and the community at-large. Therefore, *Browning-Ferris* is inapposite.

At the hearing, plaintiff suggested there is no indication that his unconscious episode posed a safety threat. He pointed to the fact that the train did not derail when he lost consciousness and to the existence of safety protocols, such as the alerter, as well as the fact that a conductor was present.

However, the existence of safety protocols is not sufficient to create a genuine issue of material fact. In *Hutton*, the plaintiff cited "an elaborate safety system" that included, among other things, "a safety device that releases pressure in the event of a buildup, a chlorine sensor and automatic closing system, and a warning alarm." 273 F.3d at 893-94. The Ninth Circuit concluded that even with the minimized risk, the plaintiff nonetheless posed a direct threat due to the severity and scale of the potential harm. *Id.* at 894.

Moreover, it is self-evident that a significant safety risk exists when a person driving a 7,000-foot 100-car garbage train loses consciousness. As Dr. Holland explained, the sudden incapacitation of a locomotive engineer could cause "serious and possibly fatal railroad accident involving a collision with another train, or vehicles or people on the track, or a train derailment

18 – FINDINGS AND RECOMMENDATIONS

that may result in a release of hazardous materials, explosion or fire." Holland Decl. ¶ 8, ECF #34.  At his deposition, plaintiff even agreed with the statement that "for a UPRR worker in a safety critical position, . . . an episode of sudden incapacitation from a seizure or any other cause poses significant and imminent risk for substantial harm to the worker, co-workers, the public, property, and the environment." Milan Dep. 86-87, ECF #27-1.

Therefore, there is no genuine issue of material fact as to whether plaintiff poses a direct threat to himself and others.  *See Hutton*, 273 F.3d at 893-94.  As such, plaintiff cannot challenge his termination as discriminatory.  *See* 42 U.S.C. § 12113.  Because this alone is a sufficient basis to grant summary judgment on the ADA claim, the court need not reach defendant's additional arguments on this claim.

### III.     ADEA Claim

Plaintiff concedes that his age discrimination claim cannot survive summary judgment. Resp. 2, ECF #28.

### RECOMMENDATION

For the reasons stated above, defendant's motion for summary judgment (ECF #27) should be GRANTED.

### SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge.  Objections, if any, are due Friday, May 03, 2019.  If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

## NOTICE

These Findings and Recommendations are not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED  April 19, 2019.

/s/ Youlee Yim You
Youlee Yim You
United States Magistrate Judge